DECISION
The Director of the Department of Mental Health, Retardation and Hospital ("MHRH") petitioned the Court for permission to transfer Ginger Collins from the Forensic Unit of the Eleanor Slater Hospital to the Adult Correctional Institution ("ACI") where she was previously incarcerated. The Director of the Department of Corrections consents to this petition. This request is made pursuant to R.I.G.L. § 40.1-5.3-9. On behalf of Ms. Collins, the Mental Health Advocate objected to the transfer petition filed by MHRH, and requested a full hearing. An evidentiary hearing was conducted by the Court in February, 2007. The Court grants the petition to return Ms. Collins to the Department of Corrections.
 Facts and Travel
In 1994, Ginger Collins was convicted of second degree murder and was sentenced to serve 60 years at the ACI with 45 years to serve and 15 years of probation.
Ms. Collins is mentally ill. She was diagnosed with mental illness during her adolescence. In 1992 and 1993, she was hospitalized at Butler Hospital, and then received intensive outpatient psychiatric treatment by Mental Health Services for Cranston, Johnston Northwest Rhode Island.
Psychiatrists at the ACI have provided Ms. Collins with multiple diagnoses including "Cyclothymia," "Psychosis NOS," "Post Traumatic Stress Disorder," "Major *Page 2 
Depression," "Dissociative Disorder," "Borderline Personality Disorder," and "Schizoaffective Disorder."
In April 2006, Ms. Collins suffered a decompensation (the exacerbation of her mental disorder due to the failure of an adequate defense mechanism) which led to her transfer to the Eleanor Slater Hospital. In the summer of 2006 Ms. Collins began to distrust her medication regimen, or the frequency with which she was provided medications, and began to limit her medication intake. In time, her mental stability deteriorated. In August 2006, she suffered another decompensation. After treatment, she has now become far more stable.
Dr. Tactacan, of the Eleanor Slater Hospital, testified that a decompensation could be a risk to a patient's safety and an untreated episode could change the patient's baseline and impair her ability to recover to her original state. Repeated decompositions could have long term negative impacts on the patient's illnesses and impair her functional ability.
Dr. Ethan Kisch, a private psychiatrist, opined that the best quality of care is to move the patient as soon as possible to stabilize her. He concluded that Ms. Collins was left in a decompensated state which grew worse over two months. Dr. Kisch testified that release to the Adult Correctional Institution would be appropriate for Ms. Collins if the ACI had adequate facilities for her care.
Dr. Friedman, a psychologist, and the Director of Mental Health at the ACI, agreed that the standard of care is to intervene early for decompensating patients. He concluded that the standard of care is to review the medication regiment of mentally ill patients periodically. Dr. Kisch testified that the criteria for the release of a patient from *Page 3 
a hospital is whether the patient is a danger to herself or to the community. He found that Ginger Collins is not presently a danger to herself or to others, but found that she continues to need after-care.
 Analysis
Rhode Island General Laws § 40.1-5.1-9 states:
 Return to confinement. — When any person transferred pursuant to § 40.1-5.3.7 has sufficiently recovered his or her mental health, he or she may, upon petition of the Director and by order of a Justice of the Superior Court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence.
Although this statute has been in effect for over 18 years, this Court has had few opportunities to pass upon this law. A well-written case by a highly respected jurist of this Court set forth the necessary elements of proof, to be viewed in conjunction with the mental health statutes. To grant a return to the ACI from the Department of Mental Health, this Court held
 The [now petitioning] Director must prove that the inmate has "sufficiently recovered his or her mental health" . . . that there is no longer clear and convincing evidence that the inmate is mentally ill or in need of special mental health services . . . [and] the Director must convince its discretion. See In Re: Kevin Clark, M.P. 99-1601, consolidated with In Re: Rahsaan Muhammed, M.P. 99-1602 and In re: Pheakiny Nem, M.P. 99-4546 (R.I.Super.Ct.) (June 21, 2000) (Savage, J.).[1] *Page 4 
Following the Clark analysis, this Court presumes that the inmate was previously transferred to the Department of Mental Health as there was clear and convincing proof that the necessary mental health services would not be provided at the ACI. This presumption is consistent with all of the evidence presented at the hearing on this motion. *Page 5 
Ms. Collins had decompensated significantly by the summer of 2006 and was transferred to the Department of Mental Health thereafter.
1. Sufficient recovery of mental health.
The moving party must first establish that Ms. Collins has sufficiently recovered her mental health. While these terms may be somewhat generic, the parties do not contest this particular element. Ms. Collins suffered a decompensation, but is now stabilized. While her mental illness continues, it is being appropriately treated and is now in control. As the Eleanor Slater Hospital Care Plan reports:
 Currently, the patient's mood appears to be stable with no paranoid thinking. Her psychosis has been resolved and she appears to be at her baseline. "ESH Care Plan, February 12, 2007, page 7, Exhibit G.
Dr. Tactacan testified that Ms. Collins was stabilized and compliant with treatment. Her condition justifies discharge from the hospital setting. Dr. Kisch, a psychologist called by the respondent, concurred that patients such as Ginger Collins could be released into the community (if not incarcerated). Dr. Kisch did not contest that Ms. Collins was stable enough to be transferred. Though he questioned the level of care at the Adult Correctional Institutions, he did not dispute that Ms.Collins had improved significantly and recovered.
The Court concludes that Ms. Collins sufficiently recovered her mental health.
2. Need for special mental health treatment.
The Court then turns to the question of whether there continues to be clear and convincing evidence that the inmate is mentally ill and in need of special mental health services. This is a more thorny issue. *Page 6 
Dr. Tactacan is Ms. Collins treating physician at the IMH. A board certified psychiatrist, he concluded that Ms. Collins is now stable, and has been stable since the summer of 2006. He diagnosed Ms. Collins as having Schizo-Effective Disorder with a Polysubstance Dependence under control in a controlled environment. As of last summer, she has an added diagnosis of Borderline Personality Disorder. Although Dr. Tactacan acknowledged that Ms. Collins has the risk of decompensation, he opined that Ms. Collins was now compliant with treatment and cognizant of the risk of stopping her medicine intake. He described his team of mental health workers, psychologists and others as concurring in the return of Ms. Collins to the ACI. He concluded that the ACI could implement Ms. Collin's (discharge) treatment plan and that she need not be in the hospital.
Dr. Kisch, a board certified psychiatrist, testifying for respondent, agreed with Dr. Tactacan's diagnosis. Ms. Collins reported to Dr. Kisch that there were gaps in her medications, and that she has feelings of great discomfort when she is incarcerated. He discouraged her return to the ACI, summarizing that she was not psychiatrically well, and suffers from a risk of relapse. He admitted on cross-examination that it would be appropriate to discharge her to the ACI if there were adequate facilities for her care.[2]
The quality of mental health treatment at the ACI has improved since the Clark decision. The number of psychologists on staff has increased. If a decompensation occurs, the protocol is to determine promptly whether the correctional facilities can continue to treat. As in the community, this may require observation of the patient in an *Page 7 
isolated setting. The ACI's standard of care for treatment of a mentally ill patient is to review medicines periodically and to intervene early for decompensation.
Ms. Collins continues to have a diagnosis which would classify her as being "mentally ill," though, as stated above, her condition is stabilized. That she remains mentally ill, however, does not alone justify her continued placement at the hospital. Mental illness, with its various afflictions, is prevalent in our society, and common to the prison. Dr. Friedman, the Clinical Director of Mental Health for the ACI, testified that at least 50% of the prison population has chronic persistent mental illness, while 3% to 5% of prisoners nationwide are receiving antipsychotic medications. Being mentally ill, in and of itself, does not mean that her condition is in need of constant hospital treatment. Both Dr. Tactacan and Dr. Kisch testified that if she were not incarcerated, Ms. Collins could be returned to a community treatment provider with mental health monitoring.
The Court concludes that Ms. Collins is impaired with a mental illness. While Ms. Collins' illness may continue, she is no longer in need of "specialized mental health services that can only be provided in a mental health facility outside of the ACI." Accordingly, the petitioning director has met the second prong of the Clark analysis.
3. Exercise of discretion
The third prong of the Clark analysis is the exercise of discretion of the Court.
It is important to note that the procedure for the transfer of all prisoners is explicitly prescribed by the state mental health statutes. Ms. Collins was transferred from the ACI to the Eleanor Slater Hospital via R.I.G.L. § 40.1-5-7. The Department of Mental Health Retardation and Hospitals is attempting to transfer her back to the ACI via the method set forth in R.I.G.L. § 40.1-5-9. *Page 8 
The statute explicitly provides that the Court has discretion in ordering a transfer to the ACI. This Court, in its exercise of discretion, should be mindful that the prisoner has been previously sentenced by the Court after a finding of guilt. In 1990, Ms. Collins was convicted of second degree murder and sentenced to 60 years with 45 years to serve at the Correctional Institution. Ms. Collins is only a portion of the way through this remarkable sentence. Hence, this Court has previously adjudicated her guilty and apportioned a sentence pursuant to an intricate analysis.[3] Ms. Collins comes to the Court having already been sentenced to serve by the Court, classified by the Department of Corrections, and transferred for treatment. If she has recovered to the point where she is stable and could be adequately treated at the prison, the Court should weigh in favor of the transfer, and guardedly limit the exercise of its discretion.
Though the Court is statutorily empowered to exercise discretion, it does so guardedly. In a recent case involving another statutory remedy (redemption of a tax title) our high court discussed the grant of discretion.
 [J]udicial discretion may be divided into two general categories. The first category of discretion accords to judges freedom of choice unhampered by legal rules. For example, a decision to recess court or to grant a continuance in a case would not normally be reviewable by an appellate court. The second class of judicial discretion involves freedom of choice, but the choices are limited, bounded by law, and reviewable. As one court has stated, the exercise of discretion "is guided by the law — see what the law declares upon a certain statement of facts, and then decide in accordance with the law — so as to do substantial equity and justice." Faber v. Bruner, 13 Mo. 541, 543
(1850); see also 7 Coke, Institutes of the Laws of England 41 (London 1797). Albertson v. Leca, 447 A.2d 383, 387 (1982, R.I.)
There, as here, the Court follows established principles of law and equity in exercising discretion, tempering its exercise with the goals of the statutory scheme. *Page 9 
Ms. Collins proffers that she should not be transferred, (and the Court's discretion should be exercised), because the Department of Corrections failed to meet the standard of care in providing mental treatment in the past. While such may be fodder for a civil action, past wrongs of the State have little, if anything, to do with Ms. Collins' future imprisonment. In considering whether to exercise its discretion, the Court looks ahead to whether adequate care will be provided during the remainder of Ms. Collins' incarceration.
Simply because there are concerns for the treatment rendered to Ms. Collins in the past, this Court cannot infer or conclude that the correctional facilities will always be inappropriate for persons with mental health issues. Respondent's sweeping statements that a correctional facility can never be appropriate display a refusal to acknowledge that institutions can adapt, improve or grow.[4] Such overbroad generalizations fail to focus on the specific needs of Ms. Collins.
The care which Ms. Collins received in the past is of limited relevance compared to the care and treatment which Ms. Collins will receive in the future. Integral to the analysis are the ongoing needs of Ms. Collins. Dr. Kisch testified that were Ms. Collins not incarcerated, the care she would receive could be provided by a community-based mental health provider. Ms. Collins does not need to be institutionalized in order to receive appropriate mental health care; instead she must be institutionalized as a consequence of her criminal sentence.
Though the population of the Adult Correctional Institutions is growing at present and constantly fluctuating to some degree, the prison's focus on mental health has clearly *Page 10 
improved. The number of psychologists has increased, as have the number of work hours provided by the psychologists each week. There are substantially more social workers and mental health workers. (See Dr. Friedman's testimony February 20, 2007 at 315.)
In concluding that Ms. Collins' past treatment may not accurately reflect the future care which she will receive, the Court does not conclude that her treatment in the past was sufficient or appropriate. Rather, some of Ms. Collins past care appears to be highly questionable. For example
 • Ms. Collins was allowed to keep a variety of medications on her person, while at the ACI. Some of these medications were not over the counter medications and some were psychotropic. (Respondent's post hearing brief, pp. 11-12).
 • Ms. Collins refused to take certain medications, such as lithium, but no medications were substituted, no warnings were given and no request to involuntarily administer the medications was pursued. (See note of psychiatrist April, 2006, Appendix to Respondent's post hearing brief, p. 344).
 • Medical records appear to be incomplete. (Respondent's post hearing brief, pp. 9-10, 13).
 • Ms. Collins was in a questionable emotional state on April 4th and 6th, 2006 and although her condition continued to deteriorate, nothing appears to be done for almost two weeks. (See Rhode Island Department of Corrections psychiatrist progress notes, pp. 344-353).
While each of these items may be deviations from standard mental health care, the Court cannot find deviations from proper standards of care without the testimony of an expert, unless the deviation is clearly within a layman's knowledge. Sheeley v. Memorial Hospital, 710 A.2d 161,164 (R.I., 1994). Instead, respondent highlights its post trial *Page 11 
memoranda with "observations" of alleged sub-standard actions of prison staff.[5] Respondent, therefore, has failed to establish that the care is substandard and that she will be "in need of special mental health services that can only be provided in a special mental health facility outside of the ACI." Clark.
Many comments of respondent are overbroad, particularly without expert testimony on the record. Respondent contends "this standard of care doesnot meet any contemporary standard for psychiatric treatment", (post-hearing brief, p. 37) and, "while it is conceivable that some individuals . . . can manage the rigors of prison life . . . Ginger Collins is not such an individual" (post hearing brief, p. 38). Such self-conclusory remarks need proof behind them. While they may indeed be correct, the evidence submitted and the reasonable inferences drawn therefrom, do not allow the Court to reach such findings.
Accordingly, the Court is reluctant to exercise its discretion.
 Conclusion
MHRH has established that Ms. Collins has sufficiently recovered her mental health and she is not in need of special mental health services which cannot be provided at the prison. The Court grants the Department's petition to return Ms. Collins to the custody of the Department of Corrections.
[1] The Court's reasoning in Clark is particularly insightful:
 The Mental Health Law is silent with regard to the question of who bears the burden of proof in a section 9 proceeding and the quantum of proof necessary to prevail in that action. Generally, the petitioner, plaintiff, or movant in any action bears the burden of proof. [citation deleted]. It necessarily follows, therefore, that the director who is petitioning for the inmate's return transfer under section 9 would bear the burden of proving, consistent with the requirements of section 9, that the inmate, who is the subject of the petition, has sufficiently recovered his or her mental health and that the Court should return the inmate to the ACI. As the director, seeking to return an inmate to the Forensic Unit under section 7 has the burden of proving that the inmate needs mental health services that cannot be provided in a correctional facility, it is logical that a corresponding burden would be placed on a director who later seeks to return the inmate back to the ACI from the Forensic Unit to establish that the inmate has sufficiently recovered his or her mental health to warrant such a return transfer.
 To determine the quantum of evidence that is required of a director petitioning for a return transfer under section 9, the provisions of sections 7 and 9 again must be considered in tandem. Section 7 mandates that a director petitioning for the transfer of an inmate from the ACI to the Forensic Unit must establish, by clear and convincing evidence, that the inmate is "mentally ill and requires specialized mental health care and psychiatric in-patient services which cannot be provided in a correctional facility." R.I. Gen. Laws Section 40.1-5.3-7. As such, an inmate who is in the Forensic Unit as the result of a transfer order of the Superior Court under section 7 must have been determined based on clear and convincing evidence, to be mentally ill and in need of specialized mental health services. Under the Mental Health Law, that inmate must remain in the Forensic Unit for the duration of his or her sentence or period of incarceration unless and until a director petitions and a court authorizes his or her return transfer to the ACI under section 9. See generally, id. Section 40.1-5.3-1 et seq. It necessarily follows, therefore, that no return transfer of an inmate to the ACI is allowable if there remains clear and convincing evidence that the inmate is mentally ill and in need of specialized mental health services that cannot be provided in a correctional facility.
 In petitioning for the return of an inmate to the ACI under section 9, the petitioning director must prove that the inmate has "sufficiently recovered his or her mental health." Id. section 40.1-5.3-9. When this language is juxtaposed with that found in section 7, it appears that the director must prove, at a minimum, that there is no longer clear and convincing evidence that the inmate is mentally ill or in need of special mental services that only can be provided in a special mental health facility outside of the ACI. In addition, the director must convince the Court to exercise its discretion to order the transfer.
 Section 9 is silent as to the quantum of proof necessary for the petitioning director to satisfy these burdens of proof. Savage, J., June 21, 2000, In re Kevin Clark, et al. MP 99-1601, 99-1602, 99-4546.
[2] Dr. Kisch preferred to place Ms. Collins in a group home setting. Obviously, this is not an option given Ms. Collin's court sentence of 45 years to serve.
[3] A list of the factors considered at the time of her sentencing is set forth in a case decided at approximately the same time.See State v. Tiernan, 645 A.2d 482, 484 (R.I. 1994).
[4] Respondent claims in its post-hearing brief "the prison, because it is a penal institution, lacks the staff and capacity to administer prn in a clinically suitable and appropriate way as a hospital can." (Respondent's Post Hearing Brief, p. 4).
[5] The Mental Health Advocate's criticism does not stop at the prison gate. The advocate also critiques the care and discharge plans of the Eleanor Slater Hospital. (Respondent's post-hearing brief, pp. 33-34).